## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** **upon the relation and for the use of the** **TENNESSEE VALLEY AUTHORITY,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:17-cv-01539** **Judge Aleta A. Trauger** |
| **AN EASEMENT AND RIGHT-OF-WAY** **OVER 3.74 ACRES OF LAND, MORE** **OR LESS, IN MONTGOMERY** **COUNTY, TENNESSEE, and J&J** **PROPERTIES, a Tennessee General** **Partnership, CUMBERLAND BANK &** **TRUST, RON SLEIGH, Trustee,** | ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM and ORDER

Before the court is the Motion to Exclude the Proposed Expert Testimony of Russell E. Parrish (Doc. No. 34) under Rules 702 and 703 of the Federal Rules of Evidence, filed by the plaintiff, the United States of America upon the relation and for the use of the Tennessee Valley Authority ("TVA"). For the reasons stated below, the motion will be granted.

## I.      BACKGROUND

TVA initiated this action on December 8, 2017 (which is also the date of taking), for the purposes of taking property under the power of eminent domain, pursuant 16 U.S.C. §§ 831–831ee, and determining just compensation for the property to be taken, in accordance with Rule 71.1(h) of the Federal Rules of Civil Procedure. (Complaint, Doc. No. 1; Jt. Stip., Doc. No. 29 ¶ 5.) TVA filed a Declaration of Taking (Doc. No. 2) and Notice of Condemnation (Doc. No. 3),

the same day. The court entered an Order granting TVA immediate possession on February 26, 2018. (Doc. No. 13.)

The property that is the subject of the condemnation is an approximately 110-acre tract of rural and unimproved land in Montgomery County, Tennessee (the "Subject Property"), owned by defendant J&J Properties ("J&J"). (Doc. No. 29 ¶ 1.) The interest acquired by TVA in the taking is a permanent easement and a 100-foot-wide right-of-way across approximately 3.74 acres of the Subject Property (the "3.74-acre right-of-way") for the erection, operation, and maintenance of electric power transmission structures supporting a 161-kV transmission line, communication circuits, and other appurtenances . (*Id.* ¶ 3.)

As shown on the parties' Stipulated Map, the Subject Property is an irregularly shaped tract located on Port Royal Road in Clarksville, Tennessee. (Doc. No. 29-1.) As described by J&J's proposed expert, the Subject Property is level to gently sloping, has adequate natural drainage, and is not in a flood plain. (*See* Appraisal Report of: Property Belonging to J&J Properties. Map & Parcel 010 016.03, Port Royal Road, Clarksville, Tennessee 37040 (September 5, 2019) ("Report" or "Parrish Report"), Doc. No. 33-6, at 83.) To its east, the Subject Property has about 1,733 feet of frontage along Port Royal Road. (*Id.*) Along the western/southwestern border, a row of trees follows the property line, beyond which lie more farmland and trees. (Stip. Map, Doc. No. 29-1.) The northern border abuts a small farm. (*Id.*) To the south/southeast, the Subject Property borders railroad tracks. (*Id.*; Doc. No. 33-6, at 83 ("Nuisances: Railroad track running along the southeastern portion of the parcel.").) The 3.74-acre right-of-way is alongside this border. (Doc. No. 29-1; Doc. No. 33-6, at 83 ("The part affected lies along the southeast side of the subject property and runs parallel to the rail road tracts [sic].").) The Subject Property has no improvements. (Doc. No. 33-6, at 83.) As described

by TVA, "[i]t is simply a large, vacant, undivided, and unimproved tract of land being used for agricultural purposes." (Doc. No. 35, at 3; *see also* Doc. No. 29-1.)

The sole issue to be resolved by this court is the amount of compensation owed by TVA to J&J for the easement and right-of-way. (*See* Doc. No. 30, at 3.) In an effort to establish the value of the property rights taken in connection with the 3.74-acre right-of-way, J&J retained Russell E. Parrish, a licensed Tennessee appraiser, to offer opinions relating to the Subject Property's value before and after the taking of the additional rights.

It is undisputed that, as of the date of taking, the Subject Property was zoned for agricultural use and, consistent with that designation, was being used for agricultural purposes. In addition, the Subject Property was and still is subject to a Greenbelt assessment.[1] (Johnstone Decl., Doc. No. 33-1 ¶ 11.) In its Application for Greenbelt Assessment, submitted in January 2008, J&J certified that it is "presently using said [Subject] property as agricultural land" and that Subject Property "will produce gross agricultural income of at least $1500 per year on average over any three years it is classified as 'greenbelt.'" (Doc. No. 33-9.) As part of the Application, J&J also agreed to "notify the assessor of any change in the use or ownership of the property which might affect the eligibility of this property for greenbelt [classification]." (*Id.*)

In his Report, Parrish correctly recognizes that the zoned and actual use of the Subject Property, as of December 8, 2017, the date of taking, was agricultural and that it continues to be used for agriculture. (No. 33-6, at 81.) However, he opines that the highest and best use of the Subject Property is that it be rezoned to E-1 Single Family Estate District and "develop[ed] for single-family development" ("highest and best use opinion"). (*Id.* at 82.) Premised upon that

---

[1] As set forth in the Application for Greenbelt Assessment, the Agricultural, Forest and Open Space Land Act of 1976, Tenn. Code Ann. § 67-5-1001 *et seq.*, "permits qualifying land to be assessed for property taxes at its use value rather than its fair market value which might be based on a more intensive use." (Doc. No. 33-9.)

initial conclusion, Parrish further opines that the pre-take value of the Subject Property was $1,377,000 ("pre-take valuation opinion") (*id.* at 94–95); that the damages to that part of the Subject Property within the right-of-way was $42,075 ("right-of-way damages opinion") (*id.* at 96); that the damages to the 13-acre portion of the Subject Property outside the right-of-way but within a 300-foot "buffer area" adjacent to the right-of-way was 50 percent, or $81,250 ("buffer zone damages opinion") (*id.* at 96, 98); and, as a result, that the after-take value of the Subject Property was $1,253,675 ($1,377,000 minus $42,075 minus $81,250) ("after-take valuation opinion") (*id.* at 99). He concludes that the total just compensation due J&J is $123,325, which he rounds up to $123,500. (*Id.* at 99, 101.) Parrish has rendered no valuation opinions based upon the Subject Property's current agricultural use.

TVA argues that Parrish's opinion that the highest and best value of the Subject Property is to "rezone to E-1 Single Family Estate District and develop for single family development" should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as both irrelevant and unreliable and that his opinion that the taking resulted in a fifty percent diminution in the value of a 300-foot buffer area outside of the easement and right-of-way should be excluded as unreliable under *Daubert*. (Doc. No. 35.) It contends that, because the pre-take and after-take value opinions are premised upon the highest and best use and buffer zone opinions, they too are unreliable. In short, TVA's position is that Parrish's opinions are not based on sufficient facts or data and are not the product of reliable methods and principles generally accepted within the appraisal profession. (Doc. No. 35.)

J&J opposes the Motion to Exclude, arguing that Parrish's opinions and proposed testimony are properly based on "his extensive knowledge, experience, training and education" and that he applied appropriate methodologies for determining the pre-take and after-take values

of the Subject Property and in assessing the amount of damages caused by the condemnation. (Doc. No. 37.) TVA, with the court's permission, filed a Reply brief (Doc. No. 40) in which it reiterates its arguments that Parrish's proposed testimony is speculative and inadequately supported.

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 was amended in 2000 to reflect the Supreme Court's decisions in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). See Fed. R. Evid. 702 advisory comm. note, 2000 amend. ("In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science."). As "gatekeepers," the district courts are charged with "discretion in determining whether . . . a proposed expert's testimony is admissible." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007).

The exercise of this discretion requires consideration of three factors: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony

must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702). The Sixth Circuit has repeatedly recognized that "rejection of expert testimony is the exception, rather than the rule." *U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 749 (6th Cir. 2016) (quoting *In re Scrap Metal*, 527 F.3d at 530). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Id.* (quoting *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998). The inquiry is "a flexible one"; "[t]he focus must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 594–95.

When assessing the admissibility of an expert's opinion, a key consideration is "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592–93. A testifying expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152 (1999). While there exists no "definitive checklist or test" for Rule 702, *id.* at 150 (citation omitted), *Daubert* establishes a number of factors that typically "bear on the inquiry," including: whether the theory or method in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Daubert*, 509 U.S. at 593–94. The *Daubert* factors apply to all types of expert evidence. *Kumho Tire*, 526 U.S. at 150. "In some cases (even cases involving nonscientific expert testimony), the factors may be pertinent, while in other cases 'the relevant reliability concerns may focus upon

personal knowledge or experience.'" *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (quoting *Kumho Tire*, 526 U.S. at 150).

The Sixth Circuit has identified some "[r]ed flags that caution against certifying an expert," including "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). Where the "factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the [challenged expert] testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). Generally, "a trial judge . . . ha[s] considerable leeway in deciding whether particular expert testimony is reliable." *Id.* at 152.

## III.    ANALYSIS

Under eminent domain, the government can take private property for public use upon the payment of just compensation to the owner. *U.S. ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 278–80 (1943). Just compensation "means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller*, 317 U.S. 369, 373 (1943). The measure of compensation is the fair market value of the property as of the date of taking. *Id.* at 374. The burden of establishing the value of the property rights sought to be condemned is on the landowner. *Powelson*, 319 U.S. at 273; *United States v. L.E. Cooke Co.*, 991 F.2d 336, 341 (6th Cir. 1993).

Property owners typically rely on expert opinion to establish that value. "[U]nder *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered . . . will testify to scientific knowledge

that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592 n.10).

In a condemnation case of this type, such valuation typically requires the resolution of three issues: "first, the before taking value of the land; second, the after taking value within the easement; and, third, the incidental damages to the land adjacent to the easement." *U. S. ex rel. Tenn. Valley Auth. v. Easement Over a Tract of Land in Madison Cty.*, 405 F.2d 305, 307 (6th Cir. 1968). Parrish expressly recognized that his mission was to address these three issues. (Parrish Report, Doc. No. 33-6, at 8.)

### A.    Highest and Best Use Opinion

In his report, Parrish states that "[a]nalysis of the Highest and Best Use of the land as though vacant and of the property as improved is essential in the valuation process" and that the "traditional definition of Highest and Best Use is 'the legally permissible, physically possible, reasonably probable and financially feasible use that produces the greatest value for the property as of the effective date of the apprais[al].'" (Doc. No. 33-6, at 82.) Based on this definition, he notes that "the probable imminent rezoning" of a condemned property may be considered in determining the fair market value of that property and that, further, "the capability of the property to be developed for one or more particular uses may be shown," so long as these uses are feasible and not remote in likelihood or time. (*Id.*) He expressly recognizes that "[s]peculative value in the hands of a future owner cannot be considered." (*Id.*)

He then purports to perform a highest and best use analysis of the Subject Property, applying the four criteria encompassed in his definition of the term, as follows:

| Legally Permissible | Any use as acceptable under the AG zoning of Montgomery County |
|---|---|
| Physically Possible | Any improvement(s) that can be built with the subject building |

| | envelope |
|---|---|
| **Financially Feasible** | The subject property is similar to other properties in the immediate area and the market area. The most feasible use would be single family development. |
| **Conclusion:** **Most Profitable/Maximally Productive:** | The conclusion is the Highest and Best Use of the subject property "as vacant" is to rezone to E-1 Single Family Estate District and develop for single family development. |

(Doc. No. 33-6, at 82.) This is the entirety of his analysis of the Subject Property's highest and best use.

Parrish also defines the term fair market value used for purposes of his appraisal:

Fair cash market value means the amount of money that a willing buyer would pay for the property and that a willing seller would accept, when the buyer is not compelled to buy and the landowner is not compelled to sell. Fair cash market value is determined after consideration of all the property's legitimate potential uses.

It is the fair cash market value at the time of the taking that must be determined and not what the property may be worth at some time in the future. Future value may be considered if, on the date of the taking, the probability of the future value had an effect upon its present value. The market value must be determined without regard to any increase or decrease in value because of the announcement or construction of the public improvement for which the property was taken.

(*Id.* at 11.)

He also states in the Report that he "investigated the surrounding area to determine the neighborhood characteristics, as well as the supply and demand within the subject market's segment of comparable land, improved sales, and rent comparables as appropriate" and that he "researched the sale of vacant land in the market area." (*Id.* at 10.) He does not identify any conclusions drawn from that investigation. His Report includes approximately 65 pages of maps, graphs, and charts of census data, demographic, income, and other "statistical information . . . to provide the reader with a general view of the economic and business climate of Montgomery

County." (*Id.* at 14; *see id.* at 15–79.) Parrish testified in his deposition that the purpose of including this information was to "give[] the reader enough information to understand this neighborhood area" (1st Parrish Dep. 12, Doc. No. 73-1, at 6), but the Report does not expressly draw upon any of this information or his definition of fair market value in reaching his conclusion that the highest and best use of the Subject Property is to be rezoned from agricultural to "E-1 Single Family Estate District."

Parrish also testified in his deposition that the land was currently zoned agricultural and was being used to raise crops. He denied knowing what kind of crops were currently being grown, stating, "That was irrelevant to me. I don't even pay any attention to the crops because property being utilized for agricultural purpose solely, if that is the only use of the property, the property would not be worth a whole lot, if that is the only use physically possible." (1st Parrish Dep. 25, Doc. No. 35-1, at 7.)

Asked what he determined would be financially feasible for the property, Parrish stated that single-family development was feasible. (*Id.* at 28, Doc. No. 35-1, at 8.) To make that determination, he stated:

> I looked at all uses in the market area and which are typically in this area, industrial, agricultural and residential. And I determined that, in my opinion, there was a lot of industrial land available so I did not feel like industrial was the highest and best use because there's several alternatives to that.

> I felt like a single-family residential development would be because that would sell for the highest price. That is the most feasible option for the land based on its topography and location and road frontage.

(*Id.* at 28–29, Doc. No. 35-1, at 8–9.) Similarly, he decided that single-family residential home development was more "feasible" than agricultural use, because,

> if a property sells for agricultural use, that is going to be in the interim use. That is not the highest and best use. That is only a use until somebody is ready to develop it. Paying market value for agricultural use property, you're not going to make

any money. . . . And so, therefore, it cannot be the highest and best use of the property.

(*Id.* at 30, Doc. No. 35-1, at 10.) In other words, he did not make an attempt to value the property based on its being used for agriculture.

TVA first argues that Parrish's highest and best use opinion should be excluded on relevance grounds, because it is not sufficiently tied to the facts of the case to assist the trier of fact. It argues that there is not a proper factual basis for the assumption that the highest and best use for the Subject Property is to be rezoned to E-1 Single Family Estate District and developed for single-family residence. Second, TVA maintains that Parrish's highest and best use opinion should be excluded on reliability grounds, as it is based solely on "a speculative assumption about future use." (Doc. No. 35, at 9.)

Just compensation is not "the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value.'" *United States v. Petty Motor Co.*, 327 U.S. 372, 377 (1946). Fair market value is determined by considering the property's "highest and best use," which is the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson v. United States*, 292 U.S. 246, 255 (1934). In the absence of contrary proof, "the highest and best use of property is presumed to be its current use." *United States v. 69.1 Acres*, 942 F.2d 290, 292 (4th Cir. 1991).

For a landowner to claim just compensation based on a proposed use, it must present evidence that the land is (1) "physically adaptable to such use" and (2) that "there is a demand for such use in the reasonably near future." *U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres*, 821 F.3d 742, 753 (6th Cir. 2016) (citing *Olson*, 292 U.S. at 255–57). That is, the landowner must establish that "his proffered use of the property [is] reasonably probable so as to avoid

speculation and conjecture." *Id.* The Sixth Circuit has held that this means the landowner must show that there is a "reasonable probability" that the land would be rezoned to allow for the proposed development. *Id.* In *1.72 Acres*, the court affirmed the district court's exclusion of expert testimony about a condemned tract's highest and best use, where the proposed expert did not present any evidence that the property could be rezoned, that the county would approve a rezoning or variance, or that the landowner had even sought rezoning. *Id.* Other courts are in accord. *See, e.g.*, *United States v. 33.92356 Acres*, 585 F.3d 1, 8 (1st Cir. 2009) (excluding the landowner's proffered expert testimony because the expert could not show a reasonable probability that the property would be rezoned); *United States v. 27.93 Acres*, 924 F.2d 506, 514 (3rd Cir. 1991) (concluding that the district court properly excluded the landowners' evidence of a proposed commercial use for a property zoned agricultural because the landowners "failed to show, by a preponderance of evidence, that a jury could reasonably find that there was a reasonable probability that the condemned tract would be rezoned commercial"); *United States v. 1.604 Acres*, 844 F. Supp. 2d 668, 679 (E.D. Va. 2011) (excluding landowners' expert testimony regarding highest and best use evidence, stating, "it is incumbent on Defendant to show that use of the property for development of Granby Tower is reasonably probable within the reasonably near future").

Thus, in this case, the court must presume that the current use of the Subject Property is its highest and best use, unless the defendants present actual evidence that a zoning change is reasonably probable. Parrish's Report contains no such evidence. Although Parrish acknowledges that the Subject Property is currently zoned, and was zoned as of the date of taking, for agricultural use, and even though he recognizes, as set forth above, that "the probable imminent rezoning" of a condemned property may be considered, he does not address the

imminent probability of rezoning the Subject Property, other than by observing that other properties in the area are being used for residential purposes. He does not state whether those properties were recently rezoned, however; he does not state that J&J has sought rezoning; and he does not address the likelihood that a rezoning application would be granted. He certainly does not conduct any analysis or study of the probability that the Subject Property will be rezoned in the near future. He also does not appear to offer an opinion that the current market value of the land as zoned agricultural is affected by its future potential development as a residential subdivision, which might be relevant. (*See* Doc. No. 33-6, at 11 (noting that "[f]uture value may be considered if, on the date of the taking, the probability of the future value had an effect upon its present value")).

Instead, he simply opines that the current highest and best use of the property is zoned E-1 Single Family Estate District, and he apparently reaches a conclusion as to the fair market value (pre-take value) of the Subject Property based on such zoning. Under these circumstances, the court finds that Parrish's opinion that the highest and best use of the Subject Property is to be rezoned is speculative and conjectural and, as such, it will not aid the trier of fact. *Accord Olson*, 292 U.S. at 255–57; *1.72 Acres*, 821 F.3d at 754–55.

Parrish's highest and best use opinion is also excludable as unreliable. In the Sixth Circuit, "it is generally accepted that there must be demonstrated . . . a market demand for the prospective use." 1.72 Acres, 821 F.3d at 754 (quoting *U.S. ex rel. Tenn. Valley Auth. v. Easement & Right of Way 100 Feet Wide*, 447 F.2d 1317, 1319 (6th Cir. 1971)). That is, "under *Olson*, . . . [t]he landowners are also required to introduce credible evidence that there is or will be a demand for the proposed use in the reasonably near future." *Id.* at 755 (citation and quotation marks omitted).

Parrish presents no evidence of actual market demand. Instead, he explains that his methodology was to examine all the potential uses of the Subject Property, including agricultural, residential, and industrial. As set forth above, he ruled out industrial use as the highest and best use simply because he determined, based on looking at "a zoning map and tax map and . . . aerial picture of those areas," that "there was a lot of industrial land available," which suggested to him that selling it for industrial use would not yield the best price. (1st Parris Dep. 28–29, Doc. No. 35-1, at 8–9.) In other words, in his view, there is an ample supply of land available for industrial development, which is likely to drive down the prices of industrial property. Likewise, he ruled out agricultural use because it would not make money. (*Id.* at 29–30, Doc. No. 35-1, at 9–10.) He did not, however, analyze the supply of land available for residential development in the area; he simply "felt" that, having ruled out the other potential uses, "single-family residential development would be [the best use] because that would sell for the highest price." (*Id.* at 29, Doc. No. 35-1, at 9.)

As TVA points out, Parrish performed no analysis of the current or future demand for residential land in the area. The Sixth Circuit has expressly recognized that the landowner

> must show that a market [for the proposed use] in fact existed on the date of taking or would be reasonably likely to exist in the near future. That is, the mere physical adaptability of the property is insufficient to discharge the burden of proving the existence of a market. Accordingly, where the landowner's expert testimony amounts to mere guess or speculation, the trial court should exclude the testimony.

*1.72 Acres*, 821 F.3d at 750 (internal quotation marks and citations omitted). In *1.72 Acres*, the court also described an earlier case in which it held that the trial court had improperly admitted expert testimony:

> In [*United States v. 47.3096 Acres of Land*, 583 F.2d 270 (6th Cir. 1978)], the government appealed from an adverse jury verdict awarding the landowner $77,000 for the taking of 47.3096 acres from a 76.7588 acre tract of farmland.

> The sole question on appeal was whether the trial court properly admitted the testimony of the landowner's expert witness, who estimated the value of the property based on its hypothetical worth as a residential subdivision. *Id.* The expert witness testified that at the time of condemnation, the landowner's property could have been divided up into several residential lots of varying sizes. Using comparable area sales, the expert witness testified as to what each lot would have sold for.

*Id.* (some internal citations omitted). On appeal, the Sixth Circuit reversed and remanded for a new trial on the basis that "the expert's testimony as to what each lot would have sold for was purely speculative and not based upon anything tangible," *id.*, particularly because the expert "offered no evidence that the property was 'needed or likely to be needed in the reasonably near future' for residential subdivision," no evidence of current or potential demand for subdivisions in that neighborhood, or evidence that the landowner had plans to subdivide. *Id.* (quoting *Olson*, 292 U.S. at 255). The trial court erred in admitting the expert's testimony, because "what he testified to was not 'fairly shown to be reasonably probable.'" *Id.* (quoting *Olson*, 292 U.S. at 255).citation and internal quotations omitted).

As in both *1.72 Acres* and *47.3096 Acres*, Parrish has not shown that he is actually in possession of facts or data that would be necessary to support his conclusion that developing the Subject Property is either financially feasible or the maximally productive use for the land. He claims to have "investigated the surrounding area to determine the neighborhood characteristics, as well as the supply and demand within the subject market[]" (Doc. No. 33-6, at 10), but he does not show that this investigation guided his opinion. Rather, his methodology amounts to mere personal opinion untethered to any objective evidence beyond a visual inspection of the land and surrounding properties, a cursory comparison of the uses of other property in the

surrounding area, and ruling out uses other than E-1 single family residential development solely on the basis that they would yield less money.[2]

Because Parrish failed to provide relevant facts and data and failed to apply reliable methods and principles to support his highest and best use opinion, that opinion will be excluded as both irrelevant and unreliable, under *Daubert*. In addition, because his opinions as to the "value overall before take" ($1,377,000) and the damages to that portion of the property covered by the easement ($42,075) depend upon his assessment of the Subject Property's highest and best use as residential, these opinions are also unreliable and subject to exclusion on that basis.

### B. After-Take Value and Buffer Zone Damages Opinions

Parrish offers an opinion that the value of the thirteen acres of the Subject Property that lies outside the right-of-way but within a 300-foot "buffer area" adjacent to the right-of-way was diminished by 50 percent, or $81,250. Besides arguing that the after-take valuation and buffer zone damages opinions, too, must be excluded because they are premised upon Parrish's unreliable highest and best use opinion, TVA seeks to exclude Parrish's buffer zone damages opinion on the basis that it is not the product of reliable methods and principles.

In his Report, Parrish explains how he reached his buffer zone opinion as follows:

### MEASUREMENT OF DAMAGES

TVA has acknowledged buffer areas of 300' for occupied buildings and 1200 for schools. The purpose of these buffers is to reduce the potential land use conflicts with trees, outbuildings, and ancillary facilities and potential visual impacts as well as exposures to Electric and Magnetic Fields (EMF).

---

[2] Parrish's opinion that the Subject Property's highest and best use is as re-zoned for single-family residential development also fails to account for the costs associated with converting vacant agricultural land into a residential development, including the cost of subdividing, building roads, extending utilities, and so forth. (*See* Johnstone Decl., Doc. No. 33-1 ¶¶ 15 ("Financial feasibility analyzes the cost of conforming a property to its proposed highest and best use (i.e., a cost estimate).").)

I have determined that the appropriate buffer area is 300' from TVA Easement and that the buffer areas are reduced 50% in value.

As basis for my determination of 50% damages within the buffer area I relied on two studies.

The first study was completed by William L. Berkley of Bluegrass Valuation Group, LLC[.] The findings were that 10% diminution in value appeared reasonable based on paired sales. The Bluegrass Valuation Group study is in the addendum to this report.

$1,377,000.00 x .10 = $137,770.00 [sic]

The second study titled: The pricing of Power Lines: A Geospatial Approach to Measuring Residential Property Values, written by David Wyman and Chris Mothorpe.

The finding were [sic] that adjacent to the power lines results in a statistically significant diminution of 44.9% for impacted lots[.]

This study can be found in the addendum of this report.

I limited my area of damages to the Buffer area and determined that 50% damages to this area is reasonable.

. . . .

Buffer diminution calculation:

13 acres x. $12,500 [calculated price per square foot] x 50%:      $81,250.00

(Doc. No. 33-6, at 96, 98.)

As "proof of Buffer Theory," Parrish includes in his Report a letter from TVA to Bobbie Howell of White Bluff, Tennessee, dated December 16, 2005. (*Id.* at 96, 97.) The letter is apparently in response to an inquiry regarding a new transmission line then proposed to serve the White Bluff area. In it TVA acknowledges "public concerns about whether any adverse health effects are caused by electric and magnetic fields (EMF) that result from generation, transmission, distribution, and use of electricity" and explains that, although there is "no agreement in the scientific or EMF research" concerning such potential health effects, TVA's "standard location practice has the effect of minimizing continuous public exposures to transmission line EMF." (*Id.* at 97.) The letter continues:

The transmission line route selection team uses a constraint model that places a 300-foot-radius buffer around occupied buildings, except schools, for which a 1200-foot buffer is used. The purpose of these buffers is to reduce potential land use conflicts with trees, outbuildings, and ancillary facilities and potential visual impacts as well as exposures to EMF. Although not absolute location constraints, these buffers weigh heavily in location decisions, influencing selection of route options and alignments.

(*Id.*)

In his deposition, Parrish testified as follows regarding the steps he took to arrive at his figure of 50 percent:

Q.     Can you tell me how you came about determining there's a 50 percent damage within the buffer zone?

A.     Again, I looked at—I've looked at numerous studies over the years, but primarily the two studies that are in my revised report dated September 5th state that a study of a paired sales analysis completed by William Berkeley of Bluegrass Valuation Group determined that based on some paired sales that 10% diminution in value appeared to be reasonable based on the paired sales. So I took the value before take times 10 percent, came up with $137,770. If I backed out what I'm prescribing as the value of the take within the easement of $42,075 that backs into essentially the same number I'm saying at 50 percent for that buffer area. Essentially, his study proved there was damages, but he prescribed diminution in value to the entire tract of land. I'm confining or restricting that damage area to 300 feet instead of spreading it across the entire tract of land.

And the second study, "The Pricing of Power Lines: A Geospatial Approach to Measuring Property Values" by David Wyman and Chris Mothorpe. They found that adjacent power lines results in significant diminution of 44.9 percent [to] impacted lots and those were lots that were adjacent to high voltage power lines.

So, again, just within rounding, they were at 45 percent, and my determination was 50 percent based on those two studies.

(2d Parrish Dep. 20–22, Doc. No. 35-2, at 8–10.)

Regarding the first study, the court understands Parrish to be saying that it supported his conclusion that a 50-percent reduction in the value of the portion of the Subject Property within the 300-foot "buffer zone," because that figure was roughly equivalent to subtracting 10% of the value of the entire Subject Property, but reduced by the $42,075 in damages (or 90% of the value

of the land as unencumbered, as calculated by him) that he had already ascribed to the area within the right-of-way: $137,00 - $42,075 = $94,925, which Parrish believes is "essentially the same number" as the $81,250.00 he reaches by multiplying the square-foot value of the land within the buffer zone by 50 percent.

Parrish does not explain the methods and principles used in either of the two studies that he purportedly relied on, nor does he explain whether he applied the same methods and principles as the authors of those studies to draw his own conclusions based on the factors relevant to the valuation of the Subject Property. Instead, his conclusion that the value of the area within the 300 foot buffer zone is diminished by 50 percent appears to be a random and speculative extrapolation of the conclusions drawn in those two studies.

Parrish also does not explain the differences between the characteristics of the Subject Property and the properties that were analyzed in the two articles. He only attached a two-page excerpt from the Berkeley study to his Report, which does not describe in any detail the properties included in that study. (*See* Doc. No. 33-7, at 26–27.) This excerpt appears to be from an appraisal conducted to determine the fair market value of a particular property before and after a taking due to an overhead powerline easement in rural Kentucky. The excerpt itself does not permit a direct comparison between the properties studied there and the Subject Property at issue here, because not enough detail about the properties in Kentucky is provided, but it does indicate that the overhead powerline easement that encumbered two of the properties in the comparison was an easement that, in both cases, went "through the interior" of the properties, resulting in a severance in at least one of the cases. One of the two properties was smaller and the easement took up a greater percentage of the total acreage. (*Id.* at 27.) As Parrish himself states, the appraisal seems to "prove" a diminution in value resulting from an overhead powerline

easement, but Parrish makes no attempt to reconcile the differences between the properties at issue there and the Subject Property here.

The Wyman study, which does appear to be a rigorous, peer-reviewed study (*see* Johnstone Decl., Doc. No. 33-1 ¶ 23), analyzes almost 5,500 vacant residential lots in rural Pickens County, South Carolina to determine the pricing impact of overhead powerline easements. The authors determined, with respect to vacant residential lots, that "adjacency to power lines results in a statistically significant diminution [in value] of 44.9% for impacted lots; lots within 1,000 feet, but not adjacent[,] suffer a pricing diminution of 17.9%." (Doc. No. 33-7, at 29.) The lots studied by the authors were typically 1.5-acres in size, but those adjacent to the right-of-way were double that—3 acres, and their value was nonetheless diminished by almost half. The study certainly substantiates the conclusion that overhead powerline easements are perceived as undesirable by persons buying residential lots and that, consequently, they will result in a significant diminution in the value of the land impacted by such easements.

Again, however, Parrish makes no attempt to reconcile the differences between the properties at issue there and the Subject Property here—a single, undivided lot zoned for agricultural use that abuts a working commercial railroad, with a powerline easement running parallel to the railroad tracks. He does not even explain the logic behind his conclusion, based on the Wyman study's finding of a 45% diminution in value for lots adjacent to a powerline easement, that a 50% diminution in value within the 300-foot buffer zone was "reasonable." Again, the figure appears unmoored to any objective data or to the specific characteristics of the Subject Property.

In short, the Parrish Report fails to establish an analytical link between the data upon which Parrish purportedly relies and Parrish's opinion that the condemnation at issue in this case

resulted in a 50 percent reduction in the pre-take value of the 13 acres within 300 feet of the right-of-way. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146. The court finds that there is "simply too great an analytical gap between the data and the opinion proffered." *Id.*

Because the defendant has not shown that the proffered opinion is "based on sufficient facts or data," that it is "the product of reliable principles and methods," or that Parrish "reliably applied [such] principles and methods to the facts of the case," Fed. R. Evid. 702, the buffer zone opinion is unreliable and, therefore, inadmissible under Rule 702. Insofar as Parrish's after-take valuation and total damages figures rely on the buffer zone damages opinion, they too are inadmissible as unreliable.

## IV.    CONCLUSION AND ORDER

For the reasons set forth herein, TVA's Motion to Exclude the Proposed Expert Testimony of Russell E. Parrish (Doc. No. 34) is **GRANTED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge